**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | No. 18 CV _____ |
| **v.** ) | |
| ) | |
| **MICHAEL J. SALERNO,** ) | |
| **BLACK DIAMOND FOREX LP,** ) | |
| **BDF TRADING LP (d/b/a Advanta FX), and** ) | |
| **ADVANTA CAPITAL MARKETS, INC.** ) | |
| **(d/b/a Advanta FX),** ) | |
| ) | |
| **Defendants,** ) | |
| ) | |
| **and** ) | |
| ) | |
| **BLACK DIAMOND INVESTMENT GROUP** ) | |
| **LLC, and** ) | |
| **ADVANTA CAPITAL MARKETS LTD., f/k/a** ) | |
| **BLACK DIAMOND CAPITAL LTD., f/k/a** ) | |
| **BLACK DIAMOND FOREX LTD.,** ) | |
| ) | |
| **Relief Defendants.** ) | |
| ) | |

## COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND PENALTIES UNDER THE COMMODITY EXCHANGE ACT

The U.S. Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, hereby alleges as follows:

### I. SUMMARY

1. Beginning in at least January 2017, Defendant Michael J. Salerno ("Salerno"), individually and as agent and officer of Defendants Black Diamond Forex LP, BDF Trading LP (a/k/a "Advanta FX"), and Advanta Capital Markets, Inc. (a/k/a "Advanta FX") (collectively, the "Black Diamond Entities"), fraudulently solicited members of the public to purportedly become

1

foreign currency ("forex") proprietary traders in the Black Diamond Entities.  The Defendants accepted at least $310,000 in proprietary traders' funds, which, on information and belief, were funneled into accounts at Relief Defendants Black Diamond Investment Group LLC ("BDIG") and/or Advanta Capital Markets Ltd. ("ACMLtd"), and used for purposes for other than forex trading.

2.      When soliciting and accepting funds, Salerno intentionally or recklessly made false and misleading statements, in websites and in written and oral communications, and failed to disclose material facts, including: (a) telling prospective traders that their deposits, termed "risk capital," would be placed into live forex trading accounts; (b) that Salerno would supplement these risk capital deposits with Black Diamond Entity funds in prospective traders' live trading accounts; (c) touting his successful forex trading career when in fact he has not personally traded forex in the last five years; (d) failing to disclose Salerno's felony conviction in 2005 for failure to file proper forms and pay employment taxes in connection with a real estate investment firm; and (e) failing to disclose Salerno's Chapter 7 bankruptcy filing and discharge in 2015.  Additionally, Salerno misappropriated prospective traders' risk capital deposits by using them for purposes other than for forex trading.

3.      By engaging in this conduct and the conduct further described herein, Defendants have engaged, are engaging, or are about to engage in conduct in violation of the Commodity Exchange Act ("Act") 7 U.S.C. §§ 1-27 (2012).  Specifically, by cheating or defrauding prospective traders and by misusing their funds, Defendants have engaged in conduct in violation of Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A), (C) (2012), and Commission Regulation ("Regulation") 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1), (3) (2017).

4.      Unless restrained and enjoined by this Court, the Defendants are likely to

continue engaging in the acts and practices alleged in this complaint or in similar acts and practices.

5.      Accordingly, the Commission brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act.  In addition, the Commission seeks civil monetary penalties for each violation of the Act, and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre-and post-judgment interest and such other equitable relief as this Court may deem necessary or appropriate.

## II.      JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2012) (federal question jurisdiction), and 28 U.S.C. § 1345 (2012) (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice that violates any provision of the Act or any rule, regulation, or order promulgated thereunder.

7.      The Commission has jurisdiction over the forex-related solicitations and transactions at issue in this case pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, and Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C) (2012).

8.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act because Defendants transacted business in this District, and acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District.

## III.    THE PARTIES

9.    Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act, 7 U.S.C. §§ 1-27 (2012), and the Regulations promulgated thereunder, 17 C.F.R. Pt. 1.1-190.10 (2017).

10.    Defendant **Michael Salerno** resides in Chadds Ford, Pennsylvania.  Salerno has never been registered with the Commission in any capacity.  In 2005, Salerno was convicted of the willful failure to collect/pay over tax in the District of New Jersey and sentenced to 21 months imprisonment.  *United States v. Salerno,* No. 2:03-cr-00374-JAP-1 (D.N.J. Feb. 14, 2005), *aff'd*, 210 F. App'x 173 (3rd Cir. 2006).  In May 2015, Salerno initiated a voluntary Chapter 7 Bankruptcy filing in the U.S. Bankruptcy Court for the Eastern District of Pennsylvania.  *In re Salerno*, No. 15-13553-ref (Bankr. E.D. Pa. filed May 20, 2015).  In September 2015 the Court issued an order discharging Salerno as debtor.  *Id*. at ECF Nos. 23 and 25.

11.    Defendant **Black Diamond Forex LP ("BDF")** is a Pennsylvania Limited Partnership formed in October 2016.  Salerno is the Managing Partner of BDF, and BDIG is its General Partner.  BDF has never been registered with the Commission in any capacity.

12.    Defendant **BDF Trading LP ("BDFT")**, is a Pennsylvania Limited Partnership, and is the purported successor to BDF.  Salerno rebranded BDF as BDFT in September 2017 by amending its name to BDFT and began marketing the new firm to the public in September or October 2017.  BDFT is an owner of the fictitious name Advanta FX.  Salerno is the Managing Partner of BDFT, and BDIG is the General Partner.  BDFT has never been registered with the Commission in any capacity.

4

13.     Defendant **Advanta Capital Markets, Inc. ("ACMI")** is a Pennsylvania corporation.  ACMI was formed and incorporated in October 2017.  Upon information and belief, ACMI is wholly owned and operated by Defendant Salerno.  ACMI has never been registered with the Commission in any capacity.  Upon information and belief, Defendant Salerno rebranded BDFT as ACMI and began marketing the new firm under the fictitious name "Advanta FX," which it registered with the state of Pennsylvania on December 7, 2017.  ACMI owns the Advanta FX name along with BDFT.

14.     Relief Defendant **Black Diamond Investment Group LLC** is a Pennsylvania Limited Liability Company formed in 2014.  Salerno is one of the three initial members and is the Managing Member of BDIG.  BDIG has never been registered with the Commission in any capacity.  Upon information and belief, BDIG holds prospective traders' risk capital deposits to be used for live forex trading.  Accordingly, plaintiff seeks an order of disgorgement against BDIG of all assets and funds that are directly traceable to Defendant Salerno's unlawful activities.

15.     Relief Defendant **Advanta Capital Markets Ltd. ("ACMLtd")** is a company incorporated and registered in the Saint Vincent and the Grenadines, under registration No. 23893 IBC 2017.  Salerno is beneficial owner of ACMLtd, which was formerly known as Black Diamond Forex Ltd., and Black Diamond Capital Ltd.  ACMLtd has never been registered with the Commission in any capacity.  Upon information and belief, ACMLtd holds prospective traders' risk capital deposits to have been used for live forex trading.  Accordingly, plaintiff seeks an order of disgorgement against ACMLtd of all assets and funds that are directly traceable to Defendant Salerno's unlawful activities.

## IV.    STATUTORY BACKGROUND

16.    Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C) (2012), applies provisions of the Act to agreements, contracts, or transactions in forex.  Specifically, Section 2(c)(2)(C)(iv) of the Act states that Section 4b of the Act, 7 U.S.C. § 6b (2012), applies to forex agreements, contracts, or transactions "as if" they were contracts of sale of a commodity for future delivery.

17.    Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A), (C) (2012), prohibits fraud in connection with any contract of sale of any commodity for future delivery that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market.

18.    Section 2(c)(2)(C)(ii)(I) of the Act states that Section 4b of the Act applies to any forex agreement, contract, or transaction that involves persons or entities who are not eligible contract participants ("ECPs").

19.    An ECP is defined by the Act, in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of (a) $10 million, or (b) $5 million and who enters the transaction "to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual." *See* Section 1a(18)(A)(xi) of the Act, 7 U.S.C. § 1a(18)(A)(xi) (2012).

20.    Regulation 5.2(b), 17 C.F.R. §5.2(b) (2017), prohibits fraud with regard to any retail forex transaction.

21.    Regulation 5.1(m), 17 C.F.R. § 5.1(m) (2017), defines a "retail forex transaction" as any off-exchange agreement, contract or transaction in foreign currency offered to, or entered into with, non-ECPs.

## V.     FACTS

22.     Salerno established the Black Diamond Entities to purportedly operate as a proprietary forex trading firm.  Salerno started an office in Philadelphia, Pennsylvania, and subsequently expanded his office footprint to include Jersey City, Miami, and Chicago.  Salerno also attempted to establish offices in other areas of the United States to include, but not limited to: Atlanta, Boston, Charlotte, Cleveland, Dallas, Denver, Detroit, Los Angeles, San Francisco, and Seattle.

### A.     The Trader Hiring Process

23.     Beginning in at least January 2017 and continuing through at least March 2018, Salerno, through the Black Diamond Entities, solicited individuals to become proprietary traders in the Black Diamond Entities.  Salerno advertised certain positions for his trading firm on online websites commonly known as LinkedIn, and Indeed.com.  Advertised positions included, but were not limited to, Forex Trader, Director of Risk Management, and Trading Floor Manager/Director of FX Operations.  The Defendants also advertised these positions on their websites, blackdiamondforex.com (BDF), bdftrading.com and/or bdf-trading.com (BDFT), and advantafx.com (ACMI).

24.     As part of the hiring process, Defendants required that prospective traders provide what was referred to as a "risk deposit" or "risk capital deposit" in varying amounts usually ranging from $1,200 to $1,900.  Defendants promised to match the prospective traders' risk capital deposits with some multiple of company funds in proprietary forex trading accounts, to share a portion of the profits from trading with the traders, and to pay bonuses tied to certain performance milestones.  Some prospective traders provided even higher risk capital deposits in exchange for more generous profit sharing and bonus terms.  Prospective traders commonly made the payments online through bdfpayments.com, a payment website set up by Salerno.

25.     Based on the Black Diamond Entities' job postings and solicitations, upon information and belief, Salerno hired no less than at least 150 prospective traders to work at the Black Diamond Entities during the relevant time period, and received no less than $310,000 in risk capital deposits.

**B.     Misrepresentations About Risk Capital Deposits and Trading Accounts**

26.     In oral and written communications with prospective traders, Salerno made numerous fraudulent misrepresentations and omissions.  Salerno represented that he would match the prospective trader risk capital deposit with a multiple of (usually 10 times) the prospective trader's risk capital deposit and place the combined funds in a live proprietary forex trading account set up for the prospective trader.

27.     Salerno promised to split profits from the live trading account 70/30 between the forex trader and the Black Diamond Entities, respectively.  For some prospective traders with higher posted risk capital deposits, the profits would be split between the forex trader and the Black Diamond Entities with more favorable profit splits for the trader.

28.     Salerno represented to prospective traders that he had an overseas bank account in Cyprus with no less than nine and one-half (9 1/2) million US dollars, money that Salerno purportedly acquired through his previous real estate ventures.  Salerno represented that these funds were "seed money" to help start up the proprietary trading firm and fund proprietary forex trading accounts.  On the BDF website he also represented that he sold off ten million dollars in real estate owned by BDIG in 2015 to fund the forex venture, although he failed to disclose that 2015 was the same year he filed for Chapter 7 Bankruptcy.

29.     Salerno represented to prospective traders that he was going to establish live forex trading accounts overseas at a company in Cyprus ("Company A").  After accepting at least $310,000 in prospective traders' funds over the course of at least 12 months, Salerno never

opened any live trading accounts at Company A.  Instead, Salerno has provided prospective traders a series of misrepresentations about live trading and/or excuses for the delay in setting up proprietary forex trading accounts.  Despite continued requests for refunds, Salerno refuses to return at least $295,000 in traders' funds.

30.     For example, on August 16, 2017, Salerno represented to certain Black Diamond Entities employees and prospective traders that the Philadelphia office was live trading and that the New York office would follow the next week.  Three days later, on August 19, 2017, Salerno told employees and prospective traders that live trading was delayed because regulatory issues in Cyprus prevented the reorganization of corporate formation documents for no less than six (6) weeks, and that EU and AML laws demanded unanticipated documents and disclosures.

31.     On November 8, 2017, Salerno represented to certain Black Diamond Entities employees and prospective traders that "our liquidity is operational and our MT4 Platform is getting the live feeds.  So for those of you that have been patient you are soon going to be trading."  However, the only trading accounts Salerno ever established for prospective traders are "demo" trading accounts that place fictitious trades and do not execute actual trades or risk any funds.  To some prospective traders he represented that these demo accounts were actual live accounts.

### C.     Misuse of Trader Funds

32.     Salerno solicited and received at least $310,000 from members of the public in the form of risk capital deposits.  Salerno never placed any prospective traders' risk capital deposits into any live forex trading accounts at Company A, or on information and belief, anywhere else, and instead used such funds for purposes other than for forex trading.  For instance, on one occasion, Salerno told another employee that the "payroll needs to be covered by risk deposits . . . ."

**D.      Fraudulent Omissions and Other Misrepresentations**

33.      Salerno did not disclose to current and prospective traders and employees that: (a) in 2003 he was indicted by a federal grand jury on an 18-count indictment charging him with wire fraud, the failure to account for and pay over employment taxes, and filing two (2) false income tax returns, (b) in 2005 he was convicted of failing to file the proper payroll tax forms and paying employment taxes to the IRS in connection with a real estate investment firm, and/or (c) that he was sentenced to twenty-one months confinement and three years of supervised release for his criminal offenses.  When confronted by Black Diamond Entity employees and prospective traders, Salerno has denied any previous felony conviction whatsoever.

34.      Salerno did not disclose to current and prospective traders and employees that in May 2015 he filed a voluntary Chapter 7 bankruptcy petition, the same year he claimed on the BDF website to have sold ten million dollars in real estate to fund the BDF forex venture.  The schedules accompanying Salerno's bankruptcy filing indicated that he was unemployed, had assets of $22,600, liabilities of $257,083, and a net negative monthly income after monthly expenditures.

35.      Contrary to representations on the BDF website about his role at BDIG and his multi-million dollar real estate sales to capitalize his forex venture, Salerno's 2015 bankruptcy schedules indicate that he owned no real estate whatsoever, and that, at that time, he held no interests in either: (a) incorporated and unincorporated businesses, or (b) partnerships or joint ventures.

36.      The BDF website touted Salerno's personal success in the forex markets and that he amassed a comfortable income in the forex markets.  However, he has never provided any documentation to substantiate his trading experience, and has not funded any personal forex trading accounts in the last five years.

37.     Salerno knew or recklessly disregarded the fact that the statements in paragraphs 26 through 31 and 33 through 36 were false.  Salerno knew or recklessly disregarded the fact that he never opened any live trading accounts at Company A, and has not provided prospective traders access to any live trading or matched any prospective traders' risk capital deposits with Defendants' money.  Salerno knew or recklessly disregarded the fact that he did not have a successful forex trading career and has not personally funded a forex trading account for the last five years.  Salerno knew or recklessly disregarded that Defendants have not established any live forex trading accounts for prospective traders in any offices nationwide.  He only offers more misrepresentations in the form of excuses for the failure to set up any trading accounts for traders.  Salerno knew or recklessly disregarded the fact that demo trading accounts are not live forex trading accounts placing actual trades with capital at risk.  Finally, Salerno also knew of his felony conviction for IRS-related fraud and his 2015 Chapter 7 bankruptcy filing, but intentionally failed to disclose either of them to prospective traders.

### E.     Salerno's Destruction of Documents

38.     The Commission sent separate document preservation "do not destroy" requests to Salerno and his Black Diamond Entities on October 20, 2017 and November 16, 2017.  Notwithstanding the requests, Salerno has destroyed multiple documents and communications relevant to the Commission's investigation in this matter.

### F.     The Nature of the Defendant's Transactions

39.     Defendants are not financial institutions, registered brokers or dealers, insurance companies, financial holding companies, or investment bank holding companies, nor are they associated persons of financial institutions, registered brokers or dealers, insurance companies, financial holding companies, or investment bank holding companies.

40.     The prospective traders from whom Defendants solicited "risk deposits," are not

ECPs.  The forex transactions to be conducted by Defendants would be entered into on a leveraged or margined basis, and they would neither result in delivery of actual currency within two days nor create an enforceable obligation to deliver between a seller and a buyer that had the ability to deliver and accept delivery, respectively, in connection with their lines of business.

## VI.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT I

**Violations of Section 4b(a)(2)(A) and (C)**
**Fraud in Connection with Retail Forex Transactions**

41.    Paragraphs 1 through 40 are realleged and incorporated herein by reference.

42.    Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A), (C) (2012), in relevant part, make it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery that is made, or to be made, for or on behalf of, or with, any other person, with certain off-exchange commodity contracts: (A) to cheat or defraud or attempt to cheat or defraud the other person; or (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contact for, or with the other person.

43.    As described herein, beginning in at least January 2017, Defendants cheated or defrauded, or attempted to cheat or defraud, and willfully deceived or attempted to deceive other persons by, *inter alia*:

(a)  willfully or recklessly omitting and/or making false representations of material fact to prospective traders, such as the following:

1)  falsely representing that they would match the prospective trader's risk capital deposit with a multiple of such risk capital deposit and place the

combined funds in a live proprietary forex trading account set up for such

prospective trader;

2) falsely telling some prospective traders in August 2017 that the

Philadelphia office was indeed live trading forex through Company A,

when in reality he never funded any live trading accounts there;

3) falsely stating that any demo accounts were actual live trading accounts,

and that they would pay traders based on the profits generated out of

Defendants' proprietary master account;

4) failing to disclose to traders Salerno's felony criminal conviction for

failing to file the proper forms and pay employment taxes in connection

with his real estate investment firm, and when confronted by employees

and prospective traders about the conviction, denying it;

5) failing to disclose Salerno's 2015 Chapter 7 bankruptcy filing;

6) falsely claiming that Salerno had a successful forex trading career

spanning several years when in fact he has not funded a personal forex

trading account for the last five years; and

(b) misappropriating trader risk capital deposits by using such funds for purposes

other than for forex trading.

44.     By this conduct, Defendants violated Sections 4b(a)(2)(A) and (C) of the Act.

45.     Salerno, acting both individually and as either principal, officer, managing

member, or managing partner of either BDF, BDFT, and/or ACMI, engaged in the acts and

practices described above willfully or recklessly.

46.     Salerno controlled BDF, BDFT, and ACMI, directly or indirectly, and did not act

13

in good faith or knowingly induced, directly or indirectly, the acts constituting the violations of BDF, BDFT, and/or ACMI alleged herein.  Therefore, pursuant to Section 13(b) of the Act, Salerno is liable for BDF, BDFT, and/or ACMI's violations of Section 4b(a)(2)(A) and (C) of the Act.

47.     Salerno acted within the course and scope of his employment, agency, or office with BDF, BDFT, and/or ACMI.  Pursuant to Section 2(a)(1)(B) of the Act and Regulation 1.2, BDF, BDFT and ACMI are liable for Salerno's violations of Section 4b(a)(2)(A) and (C) of the Act.

48.     Each fraudulent or deceptive act, and each material misrepresentation or omission of a material fact during all relevant times, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(A) and (C) of the Act.

## COUNT II

### Violations of Regulation 5.2(b)(1) and (3)
### Fraud in Connection with Retail Forex Transactions

49.     Paragraphs 1 through 40 are realleged and incorporated herein by reference.

50.     Regulation 5.2(b)(1) and (3) of the Act, 17 C.F.R. § 5.2(b)(1), (3) (2017), in relevant part, make it unlawful for any person, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction: (1) to cheat or defraud or attempt to cheat or defraud any person; or (3) willfully to deceive or attempt to deceive any person by any means whatsoever.

51.     As set forth above, since January 2017, Defendants directly or indirectly cheated or defrauded or attempted to cheat or defraud prospective traders , and/or willfully deceived or attempted to deceive prospective traders by any means whatsoever by, among other things:

(a) willfully or recklessly omitting and/or making false representations of material fact to prospective traders, such as the following:

    1) falsely representing that they would match the prospective trader's risk capital deposit with a multiple of such risk capital deposit and place the combined funds in a live proprietary forex trading account set up for such prospective trader;

    2) falsely telling some prospective traders in August 2017 that the Philadelphia office was indeed live trading forex through Company A, when in reality he never funded any live trading accounts there;

    3) falsely stating that any demo accounts were actual live trading accounts, and that they would pay traders based on the profits generated out of Defendants' proprietary master account;

    4) failing to disclose to traders Salerno's felony criminal conviction for failing to file the proper forms and pay employment taxes in connection with a former real estate investment firm, and when confronted by employees and prospective traders about the conviction, denying it;

    5) failing to disclose Salerno's  2015 Chapter 7 bankruptcy filing;

    6) falsely claiming that Salerno had a successful forex trading career spanning several years when in fact he has not funded a personal forex trading account in the last five years; and

(b) misappropriating trader risk capital deposits by using such funds for purposes other than for forex trading.

52.    Defendants engaged in such acts by the use of the mails or any means or

instrumentality of interstate commerce.

53.     Defendants engaged in such acts and practices described above willfully or with reckless disregard for the truth.

54.     By this conduct, Defendants violated Regulation 5.2(b)(1) and (3).

55.     Salerno, acting both individually and as either principal, officer, managing member, or managing partner of either BDF, BDFT, and/or ACMI, engaged in the acts and practices described above knowingly, willfully or with reckless disregard for the truth.

56.     Salerno controlled BDF, BDFT, and ACMI, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations of BDF, BDFT, and/or ACMI alleged herein.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Salerno is liable for BDF, BDFT, and/or ACMI's violations of Regulation 5.2(b)(1) and (3).

57.     Salerno acted within the course and scope of his employment, agency, or office with BDF, BDFT, and/or ACMI.  Pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017), BDF, BDFT, and ACMI are liable for Salerno's violations of Regulation 5.2(b)(1) and (3) of the Act.

58.     Each fraudulent or deceptive act, and each material misrepresentation or omission of a material fact during all relevant times, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Regulation 5.2(b)(1) and (3).

## VII.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers, enter:

A.      Find Defendants liable for violating Section 4b(a)(2)(A) and (C), 7 U.S.C.

§ 6b(a)(2)(A), (C) (2012), and Regulation 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1), (3) (2017).

B.      Enter an *ex parte* statutory restraining order and an order of preliminary injunction pursuant to Section 6c(a) of the Act 7 U.S.C. § 13a-1(a) (2012), restraining Defendants and Relief Defendants and all persons insofar as they are acting in the capacity of Defendants' and/or Relief Defendants' agents, servants, successors, employees, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with Defendants and Relief Defendants who receive actual notice of such order by personal service or otherwise, from directly or indirectly:

1.      destroying, mutilating, concealing, altering, or disposing of any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records, or other property of Defendants and/or Relief Defendants, wherever located, including all such records concerning Defendants' and/or Relief Defendants' business operations;

2.      refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records, or other property of Defendants and/or Relief Defendants, wherever located, including all such records concerning Defendants' and/or Relief Defendants' business operations; and

3.      withdrawing, transferring, removing, dissipating, concealing, or disposing of, in any manner, any funds, assets, or other property, wherever situated, including, but not limited to, all funds, personal property, money, or securities held in safes or safety deposit boxes and all funds on deposit in any financial institution, futures commission merchant, bank, credit union, or savings and loan account held by, under the actual or

constructive control of, or in the name of Salerno or any of the Black Diamond Entities or

Relief Defendants, whether individually, jointly or otherwise;

C.      Enter an order directing that Defendants and Relief Defendants make an

accounting to the Court of all of Defendants' and Relief Defendants' assets and liabilities,

together with all funds Defendants and/or Relief Defendants received from and paid to

prospective traders and other persons in connection with forex transactions, or purported forex

transactions, including the names, mailing addresses, email addresses, and telephone numbers of

any such persons from whom they received such funds from January 2017 to the date of such

accounting, and all disbursements for any purpose whatsoever of funds received from

prospective traders , including salaries, commissions, fees, loans, and other disbursements of

money and property of any kind, from January 2017 to and including the date of such

accounting;

D.      Enter an order requiring Defendants and Relief Defendants immediately to

identify and provide an accounting for all assets and property that they currently maintain outside

the United States, including, but not limited to, all funds on deposit in any financial institution,

futures commission merchant, bank, or savings and loan account held by, under the actual or

constructive control of, or in the name of Salerno or any of the Black Diamond Entities or the

Relief Defendants, whether jointly or otherwise, and requiring them to repatriate all funds held in

such accounts by paying them to the Registry of the Court, or as otherwise ordered by the Court,

for further disposition in this case;

E.      An order of preliminary and permanent injunction prohibiting Defendants, and

any other person or entity associated with them or their websites, from operating their websites

while in violation of Section 4b(a)(2)(A) and (C) and Regulation 5.2(b)(1) and (3);

F.      Enter orders of preliminary and permanent injunction restraining Defendants and all persons insofar as they are acting in the capacity of Defendants' agents, servants, employees, successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with Defendants who receive actual notice of such order by personal service or otherwise, from directly or indirectly:

1.      engaging in conduct in violation of Section 4b(a)(2)(A) and (C) and Regulation 5.2(b)(1) and (3);

2.      trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012)), including, but not limited to, trading for themselves or others;

3.      entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)) for Defendants' own personal accounts or for any accounts in which Defendants have a direct or indirect interest;

4.      having any commodity interests traded on Defendants' behalf;

5.      controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

6.      soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

7.      applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in

19

Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017); and/or

8.      acting as a principal (as that term is defined in Regulation 3.1(a),

17 C.F.R. § 3.1(a) (2017)), agent, or any other officer or employee of any person (as that

term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012) registered, required

to be registered, or exempted from registration with the Commission, except as provided

for in Regulation 4.14(a)(9);

G.      Enter an order requiring Defendants and Relief Defendants to disgorge to any

officer appointed or directed by the Court, or directly to prospective traders, all benefits received,

including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits

derived, directly or indirectly, from acts or practices which constitute violations of the Act and

the Regulations as described herein, including pre-judgment and post-judgment interest;

H.      Enter an order directing Defendants and Relief Defendants and any successors

thereof to rescind, pursuant to such procedures as the Court may order, all contracts and

agreements, whether implied or express, entered into between Defendants and/or Relief

Defendants and any of the prospective traders whose funds were received by Defendants and/or

Relief Defendants as a result of the acts and practices which constitute violations of the Act and

the Regulations as described herein;

I.      Enter an order requiring Defendants and Relief Defendants to restore to each

prospective trader the full amount of his or her risk capital deposit or capital contribution;

J.      Enter an order directing Defendants to pay civil monetary penalties, to be

assessed by the Court, in an amount not more than the penalty prescribed by Section 6c(d)(1) of

the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil

Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584

(2015), title VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2017) for each violation of the Act, as described herein;

K.      Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012); and

L.      Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Dated: April 17th 2018                           Respectfully submitted,

                                                   /s/ Barry R. Blankfield
                                                   Barry Blankfield
                                                   Elizabeth M. Streit
                                                   Scott R. Williamson
                                                   Rosemary Hollinger

                                                   U.S. COMMODITY FUTURES
                                                   TRADING COMMISSION
                                                   Division of Enforcement
                                                   525 West Monroe Street, Suite 1100
                                                   Chicago, IL  60661
                                                   (312) 596-0525 (Blankfield)

                                                   (312) 596-0537 (Streit)
                                                   (312) 596-0560 (Williamson)
                                                   (312) 596-0520 (Hollinger)
                                                   (312) 596-0714 (facsimile)
                                                   bblankfield@cftc.gov
                                                   estreit@cftc.gov
                                                   swilliamson@cftc.gov
                                                   rhollinger@cftc.gov